**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| LUIS A. PEDRAZA MELENDEZ, | |
| **Plaintiff,** | |
| **v.** | **CIVIL NO. 21-1249 (PAD)** |
| ETHICON, LLC, | |
| **Defendant.** | |

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

Plaintiff, Luis A. Pedraza Melendez, sued his former employer, Ethicon LLC, alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., and Law No. 100 of June 30, 1959, P.R. Laws Ann. tit. 29, §§ 146 et seq. ("Law 100"), and unjust termination in violation of Law No. 80 of May 30, 1976, P.R. Laws Ann. tit. 29, §§ 185a et seq. ("Law 80") (Docket No. 1).  Ethicon answered the complaint denying liability (Docket No. 6), and upon conclusion of discovery moved for summary judgment (Docket No. 29), which plaintiff opposed (Docket No. 42).  Ethicon replied (Docket No. 45).  For the reasons discussed below, the motion for summary judgment is granted and the case dismissed.

**I.     SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment "bears the initial responsibility" of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A factual dispute is "genuine" if it could be resolved in favor

of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  It is "material" if it

potentially affects the outcome of the case in light of applicable law.  Calero-Cerezo v. U.S. Dep't

of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

As to issues on which the nonmovant has the burden of proof, the movant "need do no

more than aver" absence of evidence to support the nonmoving party's case.  Mottolo v. Fireman's

Fund Ins. Co., 43 F.3d 723, 725 (1st Cir. 1995).  All "reasonable factual inferences" must be drawn

in favor of the party against whom summary judgment is sought while ignoring conclusory

allegations and unsupported speculation.  Shafmaster v. U.S., 707 F.3d. 130, 135 (1st Cir. 2013).

Based on these parameters, the record shows no genuine factual dispute as to the following facts.

## II.    FACTUAL FINDINGS[1]

### A.  Parties

Defendant is a manufacturing company within the Johnson & Johnson family of

companies, with a plant in San Lorenzo, Puerto Rico, where it manufactures surgical equipment.

See, "Statement of Uncontested Material Facts in Support of Defendant's Motion for Summary

Judgment" (Docket No. 37) ("SUMF"), ¶¶ 1-2; "Plaintiff's Opposing Statement of Material Facts"

(Docket No. 42-1) ("OSUMF"), ¶¶ 1-2.[2]  Due to the nature of defendant's operations, maintaining

---

[1] The facts are drawn from the parties' Local Rule 56 submissions (Docket Nos. 37 and 42-1).  Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." CMI Cap. Mkt. Inv. LLC v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008).  It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by specific citations to the record, that the movant contends are uncontested and material. Local Civ. R. 56(b) and (e).  The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. Id. 56(c) and (e).  Here, the court has reviewed every factual statement and counterstatement that the parties submitted plus supporting exhibits and included in this Opinion and Order those facts that are material to the case and were incorporated in statements that comport with summary judgment principles.

[2] Plaintiff admits the majority of defendant's statements of fact.  See, SUMF and OSUMF ¶¶ 1-25; 27-29; 31-33; 35-37; 39-47; 49-51; 53-66; 70-79; 85-95; 97-105; 107-114; 118; 120-124; 127-128; 132-149; 151-169; 171-175; 177-185; 187-189.  Plaintiff denies and/or qualifies the remainder of defendant's statements of fact.  See, OSUMF ¶¶ 26;

a robust Quality System is of crucial importance.  See, SUMF ¶ 3; OSUMF ¶ 3.  Defendant's

Quality System governs the manufacturing activities, processes, and products at its San Lorenzo

plant, so that they comply with corporate guidelines and government standards and regulations.

See, SUMF ¶ 4; OSUMF ¶ 4.  The goal of defendant's Quality System is to provide safe products

that meet all applicable regulatory requirements for release in the market.  See, SUMF ¶ 5; OSUMF

¶ 5.

Plaintiff is a licensed engineer that started working with defendant on March 14, 2016, as

a Process Quality Leader ("PQL").  See, SUMF ¶ 6; OSUMF ¶ 6.  As PQL, plaintiff worked in the

Automation Division, but at the end of 2018, worked as PQL in the Biosurgery Unit.  See, SUMF

¶ 7; OSUMF ¶ 7.[3]  In the Biosurgery Unit, plaintiff's supervisor used to be Ameiris Álvarez

Vázquez.  See, SUMF ¶ 27; OSUMF ¶ 27.  However, in December 2018, Ivonne García assumed

a position as Biosurgery Business Unit Manager and became plaintiff's direct supervisor.  See,

SUMF ¶ 28; OSUMF ¶ 28.  Plaintiff worked as PQL until March 9, 2020, when he was terminated

from employment.  See, SUMF ¶¶ 9, 148; OSUMF ¶¶ 9, 148.

---

30; 34; 38; 48; 52; 67-69; 80-84; 96; 106; 115-117; 119; 125-126; 129-131; 150; 170; 176; 186; 190.  Close review
of these opposing statements reveals that they are defective, insofar as: (1) they consist of conclusory assertions or
unsupported argumentation (see, Mancini v. City of Providence, 909 F.3d 32, 44 (1st Cir. 2018)("a plaintiff cannot
avoid summary judgment by relying solely on conclusory allegations")); (2) they are irrelevant or unresponsive to, or
fail to controvert, the propounded statement of fact; (3) the evidence cited does not support the opposing factual
averment; (4) the record citations do not comply with the Local R. Civ. 56's specificity requirements (see, Cabán
Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007)(noting that statements that rely on broad references
to exhibits fail to comply with Local Civ. R. 56(e)'s specific record citation requirement)); and/or (5) they introduce
numerous additional facts, but not in a separate set of numbered statements (see, Rivera-Marrero v. Presbyterian
Community Hospital, Inc., 2016 WL 7670044, *3 (D.P.R. Dec. 5, 2016)(noting that it is improper to raise additional
facts not contained in a separate, numbered section)).  See, generally, Fed. R. Civ. P. 56; Local Civ. R. 56.  And so,
given that defendant's statements of fact are properly supported, they are deemed admitted.  See, Local Civ. R. 56(c)
and (e).

[3] The Biosurgery Unit focuses on production of medical devices that stop profuse bleeding during surgeries.  See,
SUMF ¶ 8; OSUMF ¶ 8.

**B.  Plaintiff's Duties**

As a PQL, plaintiff's essential job functions were to: (1) provide technical leadership towards the identification of the causes of so-called "nonconformances" ("NCs") and process failures, and for the implementation of corrective actions and preventive actions ("CAPAs");[4] (2) provide leadership and guidance for cross functional, multilevel technical teams to ensure that the causes of nonconformances were identified and understood and that sound CAPAs were implemented; (3) analyze data, and based on the trends, recommend actions for process, equipment, and system improvement; (4) write procedures, protocols, and any other documentation needed for the enhancement of processes and systems; (5) train and educate the manufacturing team on tools for process evaluation and enhancement; and (6) handle, prepare data and present product escalation investigations.  See, SUMF ¶¶ 10-11, 17-20; OSUMF ¶¶ 10-11, 17-20.[5]  As PQL, plaintiff was aware that nonconformances were important indicators of the state of the Quality System of the Biosurgery Unit, as they could delay or even halt the manufacture of

---

[4] Nonconformances, or NCs, are deviations from the regular quality processes. See, SUMF ¶ 12; OSUMF ¶ 12. They require an investigation and often the preparation of a corrective action or preventive action plan. Id. A nonconformance report or investigation is expected to be closed within 45 days of its inception. See, SUMF ¶ 13; OSUMF ¶ 13. Nonconformances are classified as "aged" within 45 days of their origination. Id. Nonconformance metrics are tracked and monitored constantly throughout the year because they are important indicators of the Quality System. See, SUMF ¶ 104; OSUMF ¶ 104. The metrics that show the number of nonconformances in defendant's manufacturing operations provide an indication of deviations in the quality processes. See, SUMF ¶ 101; OSUMF ¶ 101. If the metric shows a reduction of nonconformances, there is an indication that the plant quality processes are being followed and corrective/preventive actions are being effective. See, SUMF ¶ 102; OSUMF ¶ 102. Inversely, if the metric shows an increase on the number of nonconformances, there is an indication that deviations to the quality process are not controlled and they need to be identified and corrected, to avoid recurrences. See, SUMF ¶ 103; OSUMF ¶ 103. When appropriate, CAPAs are implemented to prevent the recurrence of identified nonconformances. See, SUMF ¶ 14; OSUMF ¶ 14.

[5] "Escalations" are formal notifications to upper management regarding a quality finding or regulatory compliance issue. See, SUMF ¶ 21; OSUMF ¶ 21. Such issues may affect the safety, effectiveness, performance, compliance specifications or regulatory requirements of medical devices. Id. During escalation meetings, decisions are taken regarding the conducted investigations and research. See, SUMF ¶ 22; OSUMF ¶ 22. Senior site managers must assist escalations meetings to advise on the decision making. Id.

biosurgery products and their release to the market for use in surgeries.  See, SUMF ¶¶ 15-16;

OSUMF ¶¶ 15-16.

**C.  Plaintiff's Job Performance**

1.  2018 Evaluation

In 2018, while was plaintiff working as PQL in the Biosurgery Unit under the supervision

of Ms. Álvarez, she evaluated his work performance for that year, giving him a "Partially Meets /

Fully Meets" overall rating for the year 2018.  See, SUMF ¶¶ 30, 31; OSUMF ¶¶ 30, 31.  In

evaluating plaintiff's performance as PQL, Ms. Álvarez noted that there had been an increase in

nonconformances by 70%, and that from the nonconformance correction timeliness perspective,

the average was below target by 75%.  See, SUMF ¶ 34.  Ms. Álvarez also pointed out that plaintiff

needed to focus on the identification of a robust action plan to address nonconformance events.

See, SUMF ¶ 35; OSUMF ¶ 35.  Further, Ms. Álvarez indicated that as a leader, plaintiff needed

to collaborate with the Biosurgery Leadership Team to drive behavioral changes around data

integrity, day-to-day risk decision-making, and overall quality mindset.  See, SUMF ¶ 36; OSUMF

¶ 36.  Plaintiff acknowledges having received and discussed the 2018 evaluation.  See, SUMF ¶

37; OSUMF ¶ 37.

2.  Performance in 2019

On February 7, 2019, Ms. García asked plaintiff what the plan was to complete or close

the nonconformances that were classified as aged.  See, SUMF ¶ 38.  On February 11, 2019, Ms.

Álvarez sent an e-mail to plaintiff following up on the CAPA that was aged and behind track, and

on February 19, 2019, Ms. Álvarez again requested an update from plaintiff on the same CAPA,

which was overdue.  See, SUMF ¶ 39; OSUMF ¶ 39.  On April 1, 2019, Ms. García sent an email

to plaintiff to discuss the reason why the same CAPA continued to be held back.  See, SUMF ¶ 40; OSUMF ¶ 40.

On March 6, 2019, Ms. García requested plaintiff to inform her as to the detailed plan to comply with the dates on a commitment report for the closure of nonconformances.  See, SUMF ¶ 41; OSUMF ¶ 41.  On March 10, 2019, Ms. García sent another email to plaintiff requesting that he add other quality commitments, such as nonconformance actions and CAPAs, to the Tactical Implementation Plan, given that he had only included nonconformance reports in that plan.  See, SUMF ¶ 42; OSUMF ¶ 42.  Ms. García also instructed him to start using the "tool."  Id.[6]  On March 11, 2019, Ms. García sent an email to plaintiff and other employees informing that she expected no overdue nonconformances.  See, SUMF ¶ 43; OSUMF ¶ 43.  On March 29, 2019, Ms. García sent an email to plaintiff requesting an update as to the status of past due actions and a defined action plan.  See, SUMF ¶ 44; OSUMF ¶ 44.

On May 16, 2019, Ms. García received an e-mail from Jenniffer Ruiz, Senior Quality Manager, where she complained that plaintiff: (1) did not update the file on time and waited to update it at meetings, slowing down the process; (2) was late to meetings; and (3) did not comply with the release commitments.  See, SUMF ¶¶ 46-47; OSUMF ¶¶ 46-47.  On June 6, 2019, Ms. Ruiz informed plaintiff via e-mail that she was surprised that he was challenging a particular nonconformance 17 days after its origination.  See, SUMF ¶ 48.  On that same day, Ms. Ruiz sent an email to Ms. García stating that she was not in accord with plaintiff's email challenging the nonconformance because he copied other company employees and resources.  See, SUMF ¶ 49; OSUMF ¶ 49; Docket No. 37-1, p. 5, ¶ 22; pp. 19-20.

---

[6] The "tool" refers to the Biosurgery Quality Commitments Tracking Tool, which tracks the Quality System of the Biosurgery Unit, as further explained below.

### 3. Below Standard Notice

On June 17, 2019, plaintiff received a Below Standard Notice ("BSN") prepared by Ms. García, which plaintiff signed.  See, SUMF ¶¶ 50-51; OSUMF ¶¶ 50-51; Docket No. 37-3, pp. 53-59.  The purpose of the BSN was to inform plaintiff of his below standard performance and provide him an opportunity to improve on the areas that needed attention.  See, SUMF ¶ 52; Docket No. 37-3, p. 54.  In the BSN, Ms. García informed plaintiff that he needed to generate, issue and maintain on a bi-weekly basis a monitoring tool[7] for the Quality System of the Biosurgery Unit.  See, SUMF ¶ 53; OSUMF ¶ 53; Docket No. 37-3, p. 55.  She indicated that the tool needed to be updated daily and be accessible to the Biosurgery team through a shared archive or repository.  Id.  Moreover, Ms. García informed plaintiff that the tool had been requested since January 2019.  See, SUMF ¶ 54; OSUMF ¶ 54; Docket No. 37-3, p. 55.

In addition, Ms. García informed plaintiff that he needed to: (1) keep control and visibility of the commitments on the Quality System; (2) understand and communicate these pending commitments to avoid delays on the closing of commitments; (3) discuss weekly reports with the management of the Biosurgery Quality System before presenting them to the work teams; and (4) close all "aged" Biosurgery Quality System investigations and commitments.  See, SUMF ¶¶ 55-57; OSUMF ¶¶ 55-57; Docket No. 37-3, pp. 55-56.  Ms. García indicated that when a task was delegated, he needed to: (1) demonstrate responsibility in a consistent manner; (2) ask for candid feedback from his clients; (3) timely submit reports for managerial review; and (4) improve verbal and written communication with supervisors and peers to avoid misunderstandings.  See, SUMF

---

[7] See, SUMF ¶ 133; OSUMF ¶ 133 (referring to the Biosurgery Quality Commitments Tracking Tool).

¶¶ 58-60; OSUMF ¶¶ 58-60; Docket No. 37-3, pp. 57-59. On August 8, 2019, Ms. García "closed"

plaintiff's BSN. <u>See</u>, Docket No. 42-2, pp. 59-60.

### 4.  <u>Performance During and After the BSN</u>

Meanwhile, on July 17, 2019, Ms. García asked plaintiff to update the expected closing

dates for product batches under his name, to which plaintiff replied that the expected release was

June 17, 2019, which was an erroneous date. <u>See</u>, SUMF ¶ 64; OSUMF ¶ 64. On July 29, 2019,

Ms. García asked plaintiff to provide and commit to closure dates for some nonconformances

under his responsibility. <u>See</u>, SUMF ¶ 61; OSUMF ¶ 61. Plaintiff handed documents to Ms.

García regarding her request, and on July 31, 2019, she asked him to confirm the projected closure

dates included therein. <u>Id</u>. But, plaintiff replied that he handed her documentation that contained

errors. <u>Id</u>.

On September 24, 2019, Ms. García requested that plaintiff provide the plan and

projections for the nonconformance closings of the month. <u>See</u>, SUMF ¶ 62; OSUMF ¶ 62. On

the same day, Ms. Ruiz also sent an email to plaintiff asking for an update on the product batch

that had been set for release on September 20, 2019. <u>See</u>, SUMF ¶ 65; OSUMF ¶ 65. Plaintiff did

not respond to her email, and so, on September 25, 2019, Ms. Ruiz sent another email to plaintiff

asking for an update. <u>Id</u>.

Sometime in September 2019, Javier Muñiz Amarante, Plant Manager, had a one-to-one

meeting with plaintiff. <u>See</u>, SUMF ¶¶ 67-68; Docket No. 37-1, p. 46, ¶ 9. During that meeting,

Mr. Muñiz focused on the areas of opportunity that plaintiff needed to address to improve his level

of performance. <u>Id</u>. Mr. Muñiz pointed out to plaintiff the importance of improving his leadership

and organizational skills. <u>Id</u>. Mr. Muñiz had noticed that the number of nonconformances and

other quality deviation indicators were not within the targeted reduction percentages in the Biosurgery Unit, and that plaintiff seemed to have no action plan, strategy, or initiative in place to fix these issues.  Id.  Mr. Muñiz had also perceived that plaintiff: (1) would arrive unprepared to Data Review Board quality meetings; (2) did not seem have a plan to achieve the targeted reductions in quality deviation indicators; and (3) did not demonstrate command of his action plans and leadership role.  See, SUMF ¶ 69; Docket No. 37-1, p. 46, ¶¶ 9-10.  In all, plaintiff's underperformance was causing upper management to have to become more involved in his tasks more than usual or necessary.  Id.

On October 7, 2019, Ms. García received an email from Aisha Ortiz, Quality System Manager.  See, SUMF ¶ 72; OSUMF ¶ 72; Docket No. 37-1, p. 32.  Ms. Ortiz stated that plaintiff's attention to detail in presentations continued to be a challenge and that he had opportunities to improve organizational skills to keep track of multiple things at once to demonstrate due diligence. Id.  Additionally, she stated that plaintiff needed to provide coaching and education to the Biosurgery Unit, to demonstrate leadership skills as part of this role, and improve communication and presentation skills with staff during critical investigations.  See, SUMF ¶ 73; OSUMF ¶ 73; Docket No. 37-1, p. 32.

On October 18, 2019, Ms. García requested that plaintiff complete a task previously delegated to him by Ms. Ortiz so that she could review plaintiff's work before the Quality System meeting scheduled for October 21, 2019.  See, SUMF ¶ 74; OSUMF ¶ 74; Docket No. 37-4, pp. 53-55.  On October 21, 2019, Ms. García sent an email to plaintiff informing him that the notes he prepared of what was discussed in the Quality meeting were inaccurate.  See, SUMF ¶ 75; OSUMF ¶ 75; Docket No. 37-4, pp. 56-60.  In another email dated October 22, 2019, Ms. García explained

to plaintiff why his notes were incorrect and emphasized the importance of maintaining clarity when communicating.  Id.

On November 4, 2019, Ms. García informed plaintiff that the number of product batches on hold were increasing and asked him what his plan was to clean up the "hold list," requesting specific dates for this action.  See, SUMF ¶ 66; OSUMF ¶ 66.  On November 8, 2019, plaintiff sent an email to Ms. Ruiz informing and explaining why the so-called "Rapid Response Team," of which plaintiff was a member, decided not to open nonconformance investigation for a particular event.  See, SUMF ¶ 76; OSUMF ¶ 76; Docket No. 37-5, pp. 1-7.  That same day, Ms. Ruiz stated in response that she did not agree with plaintiff's assessment and wrote separately to Ms. García expressing concern about the decision taken by plaintiff and requesting a meeting to express her concern.  See, SUMF ¶¶ 76-77; OSUMF ¶¶ 76-77; Docket No. 37-5, pp. 1-5.

On November 12, 2019, Ms. García requested plaintiff to confirm if steps were on track for timely closing of nonconformances, to which plaintiff responded that some of the projected closing dates could be extended.  See, SUMF ¶ 63; OSUMF ¶ 63.  Ms. García replied that she would not allow extensions and that she expected all quality actions to be done on time.  Id.

5.  PIP

On November 22, 2019, a Performance Improvement Plan ("PIP") was issued as to plaintiff, which he signed.  See, SUMF ¶¶ 26, 80-81; Docket No. 37-5, pp. 11-14.  The PIP informed plaintiff: (1) that his performance needed improvements; (2) the areas that he needed to improve; and (3) that failure to comply with the terms of the PIP could lead to employment termination.  See, SUMF ¶¶ 82-83, 85; Docket No. 37-5, pp. 11-14.  The term of the PIP was set

to commence on December 2, 2019, and end on February 7, 2020.  See, SUMF ¶ 84; Docket No. 37-5, p. 11.

Particularly, the PIP indicated that, as a PQL, plaintiff needed to show improvement in maintaining control and visibility of all the actions of the Quality System and understanding the commitments that had to be met for timely closing of all outstanding actions.  See, SUMF ¶ 86; OSUMF ¶ 86. As stated in the PIP, plaintiff was expected to: (1) demonstrate diligence with all aging and overdue documents of the Quality System, such as nonconformances, CAPAs, discrepancy reports and actions; (2) expand the use of the Biosurgery monitoring tool to oversee the completion of actions; (3) lead the extended team to ensure timely completion of the committed actions; and (4) ensure timely closing of each commitment to avoid extensions or investigations in excess of 60 days.  See, SUMF ¶ 87; OSUMF ¶ 87.

As well, plaintiff needed to consistently demonstrate responsibility and was expected to: (1) have weekly meetings with the Biosurgery and Quality Management teams to report status and escalations; (2) make sure that actions were aligned with the performance expectations; (3) send meeting minutes and/or reports via email at the end of each meeting with management; and (4) coordinate meetings with his key stakeholders to solicit candid feedback on his performance and document such feedback in the form of a report and action plan in order to manage the necessary actions to continue improving.  See, SUMF ¶¶ 88-89; OSUMF ¶¶ 88-89.  Further, Ethicon instructed plaintiff to: (1) include in Biosurgery Unit meetings at least one educational topic on the investigation process, CAPAs, audit management, action plans and/or problem-solving tools, and document the discussions and attendance; (2) evaluate and communicate tendencies and opportunities; and (3) ensure that the events, audit results and metrics were discussed with all

Biosurgery Unit associates within a period not exceeding two weeks after the nonconformance detection, close of the audit and/or monthly results.  See, SUMF ¶¶ 90-91; OSUMF ¶¶ 90-91.

Furthermore, plaintiff was advised that he needed to demonstrate improvements in his communication style, preparation, details, and depth as to the presentations given to the various Quality System forums.  See, SUMF ¶ 92; OSUMF ¶ 92.  On this issue, he was expected to: (1) prepare his presentations ahead of time and have them revised by management; and (2) include sufficient detail and structure in his written and verbal presentations to clearly communicate the information and actions to take.  See, SUMF ¶ 93; OSUMF ¶ 93.  Also, he was advised that during the PIP evaluation period, questions on the content of his presentations and feedback received thereon would be taken in consideration.  Id.

Overall, plaintiff needed to focus in showing improvements and attention to detail to avoid faults in performance and manage timely completion of committed actions.  See, SUMF ¶ 94; OSUMF ¶ 94.  To achieve this, defendant expected plaintiff to: (1) avoid errors that cause investigations, delayed actions, and/or extensions; (2) take immediate action and employ effective communication concerning events that occur in the Quality System of the Biosurgery Unit; (3) improve the communication with Process Quality Associates in the Biosurgery Unit and establish action plans to manage opportunities for improvement; and (4) efficiently and timely oversee CAPAs.  See, SUMF ¶ 95; OSUMF ¶ 95.

### 6.  Extension to PIP

On February 14, 2020, Ms. García informed plaintiff that he still needed to improve his job performance, and thus, his PIP would be extended until March 6, 2020.  See, SUMF ¶¶ 118, 120; OSUMF ¶¶ 118, 120.  Ms. García informed plaintiff of the areas he still needed to work on, which

were the same that were discussed when the PIP was first issued.  See, SUMF ¶ 119; Docket No. 37-5, pp. 57-62.  Plaintiff was notified again that he could be terminated from employment if his performance did not improve.  See, SUMF ¶ 121; OSUMF ¶ 121.  Pedraza signed the PIP extension on March 3 and March 5, 2020.  See, SUMF ¶ 122; OSUMF ¶ 122.

7.  2019 Evaluation

On February 28, 2020, Ms. García discussed with plaintiff his written performance evaluation for the year 2019, which he signed.  See, SUMF ¶¶ 127-128; OSUMF ¶¶127-128; Docket No. 37-6, pp. 8-16.  Plaintiff's overall rating was "Partially Meets" on the "What" section See, SUMF ¶ 129; Docket No. 37-6, p. 8.  The evaluation indicated that in 2019, there had been a 100% increase in nonconformances and a 300% increase in escalations.  See, SUMF ¶ 130; Docket No. 37-6, p. 10.[8]  It also stated that 65 nonconformances were closed in an average of 66 days, when the expected average was 45 days.  See, SUMF ¶ 131; Docket Nos. 37-2, pp. 91-92; 37-6, p. 10.

In the evaluation, Ms. García noted that plaintiff delayed for several months the creation and implementation of the Biosurgery Quality Commitments Tracking Tool, which resulted in a complex increase in escalation events and over 100% increase in nonconformance reports.  See, SUMF ¶ 133; OSUMF ¶ 133.  She noted that nonconformances and nonconformance reports were past due during the year.  See, SUMF ¶ 134; OSUMF ¶ 134.  She observed that other compliance

_____

[8] As a PQL, plaintiff's objective was to improve the quality metrics of the Biosurgery Unit.  See, SUMF ¶ 109; OSUMF ¶ 109.  Such metrics include the following indicators, among others: nonconformances, human error events, finished goods failures, process deviations, process deviation in manufacturing process, packaging defects, labeling defects, calibration, maintenance nonconformances, environmental nonconformances, sterilization nonconformances, documentation; due diligence in closed nonconformance reports, and CAPAs.  See, SUMF ¶ 99; OSUMF ¶ 99. However, the Biosurgery Unit's quality metrics for 2019 indicated that the nonconformances goal was not accomplished, as there was 96.1% increase in nonconformances.  See, SUMF ¶ 106; Docket No. 37-5, p. 22, ¶ 15; p. 24.

deliverables were not being monitored by the tracking tool and these were later included at her request.  Id.  And she found that plaintiff's management of escalations and communication during difficult investigations were poor and that he required assistance from additional resources.  See, SUMF ¶ 135; OSUMF ¶ 135.  Plaintiff did not agree with the evaluation results for 2019.  See SUMF ¶¶ 134-136.

    8.  Termination

In March 2020, Ms. García contacted Johnson and Johnson's Human Resources Global Services to notify that she was not satisfied with plaintiff's performance during his PIP term, indicating that he had failed to fully meet expectations and comply with his responsibilities as PQL.  See, SUMF ¶ 139; OSUMF ¶ 139.  Specifically, Ms. García noted that plaintiff did not comply the PIP's first Target Improvement Area ("TIA"), since: (1) there had been risk of missing internal audit action plans and CAPA actions; (2) Environmental Health and Safety CAPA actions were only added in February 2020 to the quality tracking tool, and good saves and training were not included therein, resulting in a tool that was never finished as requested.  See, SUMF ¶¶ 139-140; OSUMF ¶¶ 139-140; Docket No. 37-1, pp. 33-37.

As to the PIP's second TIA, Ms. Garcia observed that: (1) there was inconsistency in the frequency and attendance to weekly meetings with the Biosurgery Unit and Quality Systems management, and no meeting minutes or reports were issued; (2) although plaintiff reported that he met with some stakeholders, no change in performance was demonstrated during the evaluation period, and no reports or action plans were documented.  See, SUMF ¶ 141; OSUMF ¶ 141.  As to the PIP's third TIA, Ms. García noted that: (1) there was no evidence of discussions or attendance lists of educational and/or continuous improvement discussions; (2) even though the

quality forum requirements for trend evaluations were met, there were no further actions for

opportunities or periodic discussions with the Biosurgery Unit team; (3) only one such meeting

was held in February 2020, to share the Quality System results for 2019; and (4) only one meeting

in March 2020 with the Biosurgery Unit associates was documented during plaintiff's evaluation

period.  See, SUMF ¶ 142; OSUMF ¶ 142.[9]

Concerning the fourth PIP's TIA, Ms. García found that: (1) plaintiff sometimes shared

metrics with the Biosurgery Unit mere hours before meetings, and in all cases, the information

provided was incomplete and required further input; (2) feedback was received of plaintiff's

disengagement and unpreparedness at the Product Quality Management Staff meeting held in

March 2020.  See, SUMF ¶ 143; OSUMF ¶ 143.  Finally, as to the PIP's fifth TIA, Ms. García

indicated that: (1) plaintiff had a trend of past due trainings and missing frequent reviews, which

impacted the site quality compliance profile; (2) his communication as to events was inconsistent;

(3) there was no record of action plans or the manner in which communication with some of the

Quality Systems associates was improved; and (4) a CAPA was verbally reported at risk of not

completing all actions on time.  See, SUMF ¶ 144; OSUMF ¶ 144.

Moreover, in Ms. García's view, plaintiff failed to show leadership and proactiveness in

his role as a PQL, as he: (1) required too much follow up, direction, and oversight for a role at his

level; (2) repeatedly failed to exercise the leadership and proactiveness required to improve the

quality profile of the Biosurgery Unit; and (3) could not be relied on upon to timely comply with

due dates.  See, SUMF ¶ 148; OSUMF ¶ 148.  And so, on March 9, 2020, plaintiff was terminated

from employment.  Id.  After plaintiff's termination, the PQL position remained open for several

---

[9] Plaintiff concedes that he did not document attendances and discussions held on weekly meetings, as requested in the PIP, but claims that doing so was "unreal."  See SUMF ¶ 145; OSUMF ¶ 145; Docket No. 37-2, pp. 68-70.

weeks until Laura Rodríguez, another Johnson and Johnson employee, was recruited for the position as part of a special assignment.  See, SUMF ¶ 149; OSUMF ¶ 149; Docket No. 37-6, pp. 21-24.[10]

### 9.   Biosurgery Unit and WhatsApp Chat

Plaintiff's co-workers in the Biosurgery Unit included Nelson Vincens, Carlos Hernández, Jonathan Nieves, Gustavo Classe, John Valentin, Rolando Santiago, and Arnaldo Colón, who are all men that worked under Ms. García's supervision in 2019 and 2020.  See, SUMF ¶ 180; OSUMF ¶ 180.  One female worker, Xamayra Arcelay, was the Manufacturing Manager at the Biosurgery Unit and directly reported to Ms. García.  See, SUMF ¶ 160; OSUMF ¶ 160.  As Manufacturing Manager, Ms. Arcelay was responsible for the effective utilization of available resources to maintain reliable, efficient, and productive operations, assuring that short and long-term manufacturing goals were achieved, managing the department budget, and providing leadership in financial and capacity planning. See, SUMF ¶ 161; OSUMF ¶ 161.  Ms. Arcelay's responsibilities were different than those of a PQL.  Id.

In 2019, Ms. García and other employees from the Biosurgery Unit participated in a WhatsApp chat group called the "Bio-Girls" (the "Chat").  See, SUMF ¶ 177; OSUMF ¶ 177.  Ms. García did not create the chat but was included by another employee.  Id.  Plaintiff did not know who participated in the chat, but he assumes that they all must have been women.  See, SUMF ¶ 176; Docket No. 37-3, p. 106.  Plaintiff did not request to be included in the chat and did not know what was discussed therein, except for one message that was shown to him by another employee regarding a shipment notice.  See, SUMF ¶¶ 172-175; OSUMF ¶¶ 172-175.

---

[10] Ms. García had never worked with Ms. Rodríguez before, and they did not have a personal acquaintance.  See, SUMF ¶150; Docket No. 37-6, pp. 21-24.

García participated in the chat occasionally.  See, SUMF ¶ 178; OSUMF ¶ 178.  The chat addressed day-to-day matters of the manufacturing floor, like available and movement of inventory, purchases of materials, sanitation of rooms, and production lot flow.  See, SUMF ¶ 179; OSUMF ¶ 179.  The chat did not address matters pertaining to Quality Systems processes.  See, SUMF ¶ 180; OSUMF ¶ 180.  Those matters were discussed in daily production meetings, weekly meetings of the Biosurgery Unit, and via email.  Id.  As PQL, plaintiff was empowered to meet, confer, and communicate with the team regarding any quality concerns.  Id.

10. Other Observations

During his employment, plaintiff was never told a discriminatory remark and he never complained about gender discrimination.  See, SUMF ¶¶ 186-187; OSUMF ¶ 187; Docket No. 37-3, p. 121.  But, after he was terminated, he submitted a gender discrimination charge with the Equal Employment Opportunity Commission.  See, SUMF ¶¶ 188-189; OSUMF ¶¶ 188-189.

III.    DISCUSSION

A. Title VII

1.  Disparate Treatment

Plaintiff alleges that Ethicon discriminated against him because of his gender in violation of Title VII (Docket No. 1).  Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  A Title VII discrimination claim may be proven with direct or circumstantial evidence of discrimination.

Pedraza Meléndez v. Ethicon, LLC
Civil No. 21-1249 (PAD)
Opinion and Order
Page 18

Direct evidence consists of evidence "which, in and of itself, shows a discriminatory animus." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996). It comprises "statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000). The statement must be "directly tied" to the decision, Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc., 999 F.3d 37, 52 (1st Cir. 2021), demonstrating on its face that the decision "was reached for discriminatory reasons." Danville v. Regional Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002). As such, it "proves the fact of discriminatory animus without inference or presumption." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998). There is no such evidence in this case.

In the absence of direct evidence of discrimination, plaintiff may rely on the three-stage burden shifting framework drawn from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973). The goal of this framework is to "progressively . . . sharpen the inquiry into the elusive factual questions of intentional discrimination." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). Under this framework, plaintiff has the initial burden of establishing a *prima facie* case of discrimination. See, LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842-844 (1st Cir. 1993)(discussing framework). The burden "is not onerous." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

If a *prima facie* case is established, a rebuttable presumption of discrimination arises, switching to the employer the burden of articulating a "legitimate, nondiscriminatory reason" for the action at issue. LeBlanc, 6 F.3d at 842. This is a burden of production, not of persuasion, such that the employer is merely required to set forth through the introduction of admissible evidence,

Pedraza Meléndez v. Ethicon, LLC
Civil No. 21-1249 (PAD)
Opinion and Order
Page 19

reasons for its action "which would support a finding that unlawful discrimination was not the cause of the challenged employment action."  Sánchez v. Puerto Rico Oil Co., 37 F.3d 712, 720 (1st Cir. 1994).  Id.

Should the employer satisfy this burden, the inference arising from the *prima facie* phase drops from the case.  See, Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 (1st Cir. 2000)(so noting).  In that instance, the sole remaining issue "is discrimination *vel non*," which comes front and center.  Vélez, 585 F.3d at 447.  To carry the devoir of persuasion on this ultimate issue, the plaintiff must identify probative evidence that the reason given by the employer for its action is pretextual, that is, not its true reason but a pretext for discrimination.  Id.  This step effectively "merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination," Domínguez-Cruz, 202 F.3d at 430 (quoting Burdine, 450 U.S. at 256), a burden which remains with the plaintiff "at all times."  Burdine, 450 U.S. at 253.

### a. *Prima Facie* Phase

To establish a *prima facie* case plaintiff must show that: (1) he is a member of the protected class; (2) he was qualified for position he held; (3) he was subjected to an adverse action; and (4) the position remained open or was filled by a person whose qualifications were similar to his.  See, Douglas v. J.C. Penney Co., 474 F.3d 10, 14 (1st Cir. 2007)(articulating elements).  Given that the burden for establishing a prima facie case is not onerous, the court assumes that plaintiff established a prima facie case of sex discrimination.

### b. *Employer's Showing*

Ethicon points out that it terminated plaintiff's employment on account of poor performance, as demonstrated by his: (1) overall lack of leadership, proactiveness, communication

skills, and competence to effectively perform his role as PQL; (2) inconsistent compliance or noncompliance with deadlines and quality metrics goals; (3) need for constant follow-up, direction, and oversight from management; and (4) failure to meet the results and expectations delineated in the BSN and PIP, among other things. These are legitimate, nondiscriminatory grounds for termination, closely linked to the proper operation of the employer's business.[11]

### c. Pretext for Discrimination

The inquiry moves to the next stage, placing upon plaintiff the burden of showing that the employer's reasons for its decisions were pretextual and that the record would permit a reasonable jury to infer that the real reason was discriminatory animus based on his gender. In this context, pretext "means something worse than a business error." Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005). It means deceit –a lie– a made-up story "to cover one's tracks." Id. Its analysis is "more demanding" than the assessment of whether a *prima facie* case has been established. Mariani-Colón v. Department of Homeland Sec. ex. rel. Chertoff, 511 F.3d 216, 222 (1st Cir. 2007). As such, it moves the inquiry to "a new level of specificity," Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003), directing the court's focus to the perception of the employer, to determine whether it believed that the stated reason is real. See, Ronda-Pérez, 404 F.3d at 45 (discussing topic).

---

[11] See, Giron v. Tyco Electronics Corp., 762 Fed. Appx. 233, 238 (6th Cir 2019)(employee's failure to correct on-going performance deficiencies and meet reasonable expectations under a PIP constitute legitimate, nondiscriminatory justification for termination); Brown v. Ohio State Univ., 616 F.Supp.2d 740, 751 (S.D. Ohio 2009)(lack of leadership, untimely completion of assignments and poor communication recognized as legitimate nondiscriminatory reasons for termination); Roussin v. Covidien LP, 2016 WL 393182, *6 (D.Mass. Feb. 1, 2016)(lack of leadership, repeated failures to meet assigned deadlines, and unsatisfactory preparation of various work papers reflect legitimate nondiscriminatory reasons for termination); Mendillo v. Prudential Ins. Co. of America, 156 F.Supp.3d 317, 339 (D. Conn. 2016)(legitimate, nondiscriminatory reasons for termination include failure to achieve quality goals and to correct performance deficiencies identified in PIP).

Pretext may be found where there are "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in an employer's proffered reasons for termination "that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 124 (1st Cir. 2011). But there are no such weaknesses, implausibilities, inconsistencies, or contradictions here. There is no evidence that Ethicon's decisions were driven by gender rather than by the legitimate business objectives. The record is devoid of proof that Ethicon invoked those objectives as an excuse to cover up discriminatory animus.

The Company has been consistent in the explanation that it has presented for its actions, an element incompatible with an assertion of pretext for discrimination. See, Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 93 (1st Cir. 2014)(one way to establish pretext is to show that employer gave different and arguably inconsistent explanations for its action, unless the record conclusively reveals that the real motive was an unstated, but legitimate reason); Wierman v. Casey's General Stores, 638 F.3d 984, 995-996 (8th Cir. 2011)(discrepancy on documented reasons for plaintiff's termination immaterial where the underlying reason remains consistent).[12] As well, there is no evidence that the employer deviated without cause from its policies. See,

---

[12] Along the same line, compare Rademacher v. HBE Corp., 645 F.3d 1005, 1007, 1011-1012 (8th Cir. 2011)(dismissing discrimination claim in part because the employer's reasons for its decision did not vary); Serrano v. Donahoe, 2014 WL 4924434, *6 (D.P.R. Sept. 30, 2014)(dismissing discrimination claim where record showed consistency in the asserted basis for the employer's decision); Taylor v. Got Beer, Inc., 2007 WL 9754086, *5 (N.D. Ala. Aug. 22, 2007)(dismissing discrimination claim where legitimate, nondiscriminatory reason articulated by employer did not change), with Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 449 (1st Cir. 2009)(finding pretext in part because the employer did not initially provide plaintiff with any reason for firing him, one month later, the company's human resource director told the EEOC and the ADU that plaintiff had been fired for violating the company's policy on receiving gifts from suppliers, and in responding to the lawsuit over a year later, the company said for the first time that plaintiff had been fired for stealing and selling company property).

Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 68 (1st Cir. 2008)(noting the relevance in the pretext analysis of evidence that the defendant deviated inexplicably from one of its standard business practices).

Even so, plaintiff alleges that "he had no prior history performance issues even though he had worked for Ethicon since March 2015" (Docket No. 42, p. 3). The record shows otherwise. Ms. Álvarez was plaintiff's supervisor immediately before Ms. García became his supervisor. She evaluated Pedraza's performance in 2018, and on the "What" section of his evaluation gave him a "Partially Meets," stating that he did not comply with the Company's target goals. Particularly, she noted that plaintiff needed to focus on the identification of a robust action plan to address nonconformance events after there had been an increase of 70% in nonconformance events and its timeliness was below average. See SUMF ¶¶ 34-35. Thus, in 2018, Ms. Álvarez had already noted that plaintiff's performance was not "without issues."

An employee's performance can deteriorate over time, or new management can notice issues that were not noticed before. See, Crowley v. Perdue, 318 F.Supp.3d 277, 290-291 (D.D.C. 2018)("The court notes, however, that an 'employer's description of an employee's performance as unsatisfactory will not be deemed pretextual just because the employee was a good performer at an earlier time'")(quoting Hicks v. Gotbaum, 828 F.Supp.2d 152, 163 (D.D.C. 2011)). While an employee may have done his job well in the past, there is nothing that necessarily prevents his performance from deteriorating later or new management stepping in and starting to notice existing issues. See, Zapata v. Univision Puerto Rico, Inc., 914 F.Supp.2d 156, 172 (D.P.R. 2011)("There is no way a rational jury could find weakness, inconsistency, or implausibility in a company

deciding that an employee who has performed well on some occasions and poorly on others should have his duties changed, performance scrutinized, or ultimately be fired").

Furthermore, there were objective indicators in the performance evaluations.  See Douglas, 474 F.3d at 14 ("[H]is performance evaluations showed not only subjective evaluations of poor performance, but also that Douglas consistently failed to meet the numerical sales and inventory targets set for him on a yearly basis. In particular, J.C. Penney presented evidence that by 2002, Douglas' sales were less than 75% of what they were in 1997").  Here, plaintiff's job performance was rated "Partially Meets" in the "What" part of the evaluations for years 2018 and 2019, which were prepared by two different supervisors.  The "What" section of the performance evaluation of 2018 and 2019 referred to company goals that could be quantified or measured, as for example, metric goals.  See, SUMF ¶¶ 32-35, ¶¶ 129-131, ¶¶ 133-134.

Plaintiff alleges that his termination was a pretext to discriminate because he completed the "Below Standard Notice by August 8, 2019, and Supervisor Ivonne Garcia did NOT document any performance issues afterwards between August 8, 2019, thru November 2019" (Docket No. 42, p. 3).  Plaintiff tries to aver that he had no performance issues *after* the BSN was completed, and that the subsequent PIP was unwarranted.  After the BSN completion (on August 2019) and before the PIP of November 2019, plaintiff continued to receive multiple e-mails from Ms. García of follow up on the timely closures of commitments due to his lack of communication.  Ms. García's e-mails evidence the constant supervision that plaintiff needed from his supervisors to perform his work.  See, SUMF ¶¶ 64-65, ¶¶ 71-75.

Moreover, on October and November 2019 (after the BSN ended and before the PIP started) Ms. García received negative feedback on plaintiff's performance from two upper

managers, Ms. Ortiz, Quality System Manager, and Ms. Ruiz, Sr. Quality Operations Manager. See, SUMF ¶¶ 67-69, ¶¶ 72-73, ¶¶ 76-77.  And on September 2019, the Plant Manager, Mr. Muñiz, felt the need to discuss with plaintiff the areas of opportunity in his performance.  See, SUMF ¶¶ 67-69.  Regardless of plaintiff's perception of himself, his performance issues were not only noticed by Ms. García, but also by other upper management.

In this light, the PIP should not have come up as a surprise to plaintiff, since at the conclusion of the BSN, on August 2019, he was given notice that a PIP could follow (Docket No. 45, p. 7).  Also, the PIP of November 2019 signed by him referenced a conversation held with Ms. García on August 8, 2019 (at the conclusion of the BSN) where it was "agreed that although some areas of the action plan had shown improvements . . . the performance would continue to be monitored with a [PIP]." (Docket No. 45 at p. 7, Docket. No. 37-5 at p. 11).

Further, Ethicon's Performance Policy Standards, which plaintiff received, states that if an employee does not meet the standards of performance applicable to a job position, a corrective action can be taken through a PIP without the need of any previous individual corrective actions: "A formal performance improvement plan can be developed for an employee that has a performance that does not satisfy the expectations *instead of advancing towards the individual corrective action*" (Docket No. 37-3, p. 12)(emphasis added).  See also, SUMF ¶¶ 23-26.  So, Ms. García had the option to notify the PIP without having to issue first an individual corrective action. See, Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1120 (10th Cir. 2007)("Because progressive discipline was entirely discretionary in such cases, and U.S. Bank, therefore, did not ignore any

established company policy in its choice of sanction, *the failure to implement progressive discipline is not evidence of pretext*")(emphasis added).[13]

Plaintiff alleges that he was discriminated because a female, Ms. Arcelay, received a more lenient treatment than him. See SUMF ¶ 159.  Ms. Arcelay was the Manufacturing Manager and she was also a direct report to Ms. García.  As Manufacturing Manager, Arcelay's position was not comparable to plaintiff's.  See, SUMF ¶¶ 161-162.  To prove disparate treatment, a plaintiff must need to show that he was similarly situated to the employee that he alleges received superior treatment.  See, Lockridge v. The Univ. Of Maine Sys., 597 F.3d 464, 471 (1st Cir. 2010) (Docket No. 29, p. 9).  Plaintiff's allegation of disparate treatment is unsupported since he fails to show that Ms. Arcelay was similarly situated to him.  Additionally, plaintiff does not bring forth any evidence that Ms. Arcelay's job performance was at the same or similar level of non-compliance as his and that notwithstanding Ms. García treated her more favorably.[14]  Considering the differences between plaintiff's and Ms. Arcelay's conditions, and the lack of evidence suggesting preferential treatment, plaintiff's contention must be rejected.  See, Lockridge, 597 F.3d at 471 (rejecting differential treatment claims under similar circumstances).

---

[13] See also, Zapata, 914 F.Supp.2d at 172 ("[Plaintiff] also argues that it is implausible . . . that Univision acted on performance grounds when his personnel file did not contain formal warnings or complaints prior to March 31, 2008 . . . . While an inexplicable deviation from standard business practices may demonstrate pretext, a plaintiff must first show there is a trial worthy issue as to whether such a standard practice existed. Here, *[plaintiff] has not established, or even inferred, whether there was a standard for when a formal performance complaint must be made, or whether there was a practice requiring formal discipline before altering an employee's duties.*")(emphasis added).

[14] Ms. Arcelay was a Manufacturing Manager and, like plaintiff, directly reported to Ms. García.  However, she was responsible for effective utilization of resources, ensuring that short and long-term manufacturing goals were achieved, managing budgets, and providing financial advice, among other things.  Meanwhile, the job functions of a PQL, such as plaintiff, were different and arguably more technical (i.e., dealing with nonconformances, implementing CAPAs, analyzing data, drafting plans to improve processes, equipment, and systems, etc.) and leadership-oriented (i.e., training and educating Biosurgery Unit associates, etc.).  Aside from having to report to the same supervisor, the court cannot see any other similarities in the circumstances of these employees.

Pedraza Meléndez v. Ethicon, LLC
Civil No. 21-1249 (PAD)
Opinion and Order
Page 26

Plaintiff alleges that he was discriminated because he was replaced by a less qualified female employee, Ms. Rodríguez (Docket No. 42, pp. 2-3). To support his contention, Pedraza makes reference to the deposition transcript of Ms. García, where she states: "I don't think [Ms. Rodríguez] is an engineer." Id. at p. 3. The Court finds this contention by plaintiff to be insufficient and conclusory, lacking of any developed argumentation, thus, the argument is considered waived. See, U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); Randa J.B. v. Saul, 2020 WL 6110967, *5 (D. Me. 2020)("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones") (citations omitted).

Moreover, the fact that Ms. Rodríguez may have had a science degree, as testified by Ms. García, did not make her less qualified than plaintiff. The job description of a PQL, states in the "Education" section that: "Bachelor Degree in Engineer or Science is required" (Docket. No. 45, p. 9). Therefore, Ms. Rodríguez was not necessarily less qualified than plaintiff and the argument fails. More importantly, the record shows that Ms. Rodríguez was selected to the PQL position as part of a *temporary* assignment and did not stay in the PQL position (Docket No. 45, p. 10), a fact admitted by plaintiff.[15]

Plaintiff alleges that he was excluded from participation in the Chat and therefore he missed out on work matters. See, SUMF ¶ 170. However, the allegation on this is scarce and insufficient upon considering that plaintiff did not know what was discussed in the Chat. See, SUMF ¶¶ 174-175. The uncontested evidence shows that the Chat did not deal with work matters that pertained

---

[15] SUMF ¶149 was admitted by plaintiff. Also, refer to note number 1, u.

Pedraza Meléndez v. Ethicon, LLC
Civil No. 21-1249 (PAD)
Opinion and Order
Page 27

to plaintiff's PQL role; and there is nothing in the record to indicate that Ms. Garcia ever made

discriminatory remarks or comments in the Chat; or that her participation in the Chat affected

plaintiff's employment opportunities or resulted in a disparate treatment against him.

Plaintiff's conclusory allegation without any supporting documentation and/or citation to

the record is simply insufficient to create a genuine issue of material fact precluding summary

judgment.  See, Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 45 (1st Cir. 2011)("We

have warned parties before that trial judges are not 'mind readers,' and that '[i]f claims are merely

insinuated rather than actually articulated,' courts are not required to make determinations on

them")(quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir.1991)).  Bold assertions

of discrimination are inadequate to support a finding of "proscribed discrimination."  Williams v.

CVS Pharmacy, Inc., 2012 WL 3150780, *17 (E.D. Tex. Aug. 2, 2012).   Under these

circumstances, the Title VII disparate treatment claim must be dismissed.

2.  Hostile Work Environment

Plaintiff alleges that he was subjected to a hostile work environment (Docket No. 1, ¶¶ 15,

29).  To prove a *prima facie* case of hostile work environment, a plaintiff must show that he was

"subjected to severe or pervasive harassment that materially altered the conditions of [his]

employment."  Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005).  The harassment must

be objectively and subjectively offensive, one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so.  Id.

To appraise the environment, courts examine all circumstances, including "the frequency

of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with plaintiff's work performance."  O'Rourke

Pedraza Meléndez v. Ethicon, LLC
Civil No. 21-1249 (PAD)
Opinion and Order
Page 28

v. City of Providence, 235 F.3d 713, 728-729 (1st Cir. 2001).   To support liability, the circumstances must reflect a workplace "permeated with discriminatory intimidation, ridicule, and insult." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).   The employer's actions must stem from a discriminatory or retaliatory animus, "which may be factored into the hostile work environment calculus." Noviello, 398 F.3d at 93.

Plaintiff's allegations closely track his disparate discrimination claims.   In this setting, courts have observed that allowing standard discrimination or retaliation claims "to be converted into a contemporaneous hostile work environment claim runs the risk of significantly blurring the distinction between the elements that underpin each cause of action and the kinds of harm each was designed to address." LaBrecque v. Mabus, 2017 WL 650060, *32 (D. Me. Feb. 16, 2017). Discrete acts consisting of discrimination claims are different in kind from a hostile work environment claim that must be based on severe or pervasive discriminatory intimidation, ridicule and insult. See, Lester v. Natsios, 209 F.Supp.2d 11, 33 (D.C.C. 2003)(discussing topic).

If the same set of facts could support discrimination, retaliation and hostile work environment claims, federal and state provisions that provide a separate cause of action for each of them "would be rendered superfluous." Gardner v. Tripp County, S.D., 66 F.Supp.2d 1094, 1100-1101 (D.S.D. 1998).   Plaintiff cannot re-purpose the same discrete acts he claims are discriminatory or retaliatory "to assert a broader hostile environment cause of action." Williams v. Spencer, 883 F.Supp.2d 165, 180 (D.D.C. 2012).[16] For this reason, the court focuses on whether,

---

[16] See also, McCann v. Tillman, 526 F.3d 1370, 1379 (11th Cir. 2008)(discrete acts cannot be brought under a hostile work environment claim that centers on discriminatory intimidation, ridicule, and insult); Dávila-Feliciano v. Puerto Rico State Ins. Fund Corp., 754 F.Supp.2d 351, 365 (D.P.R. 2010)("discrete acts [are] not components of a hostile

"in the aggregate," the discrete acts amount to a hostile work environment.  Bhatti v. Trustees of

Boston Univ., 659 F.3d 64, 74 (1st Cir. 2011); LaBrecque, 2017 WL 650060, at *32.  And, the

answer is no.

In the main, plaintiff complains about employment actions reasonably linked to legitimate

business objectives, not to instances of discriminatory intimidation, ridicule, and insult, a fatal flaw

in the claim.  See, Malone v. Lockheed Martin Corp., 610 F.3d 16, 20-22 & n. 12 (1st Cir.

2010)(refusing to find a hostile work environment in plaintiff's claims that he received a series of

escalating reprimands, deteriorating performance reviews, and eventually a demotion, as those

measures were the result of legitimate employer concerns, driven by plaintiff's absenteeism);

Portugues-Santa v. B. Fernandez Hermanos, Inc., 614 F.Supp.2d 221, 236-240 (D.P.R.

2009)(dismissing hostile work environment claim in absence of disparate treatment, when

remaining allegations were too weak to raise a colorable claim).  The hostile work environment

claim must be dismissed.

**B.  Law 100**

Plaintiff alleges that the employer discriminated against him because of his sex in violation

of Law 100 (Docket Nos. 1, ¶ 61; 180, ¶¶ 49-51).  Law 100 prohibits discrimination in employment

because of various characteristics, including sex.  See, P.R. Laws Ann. tit. 29, § 146 (setting forth

prohibition).  For all intents and purposes, 'it is the Puerto Rican analogue to Title VII."  Rivera-

Rivera v. Medina & Medina, Inc., 898 F.3d 77, 97 (1st Cir. 2018).  Sex discrimination claims

asserted under both statutes are "coterminous."  Dávila v. Corporación de Puerto Rico para la

---

work environment"); Parker v. State of Del., Dept. of Public Safety, 11 F.Supp.2d 467, 472 (D.Del. 1998)(plaintiff
cannot base hostile work environment claim on employment decisions that underpin her disparate treatment claim).

Difusión Pública, 498 F.3d 9, 18 (1st Cir. 2007).  As discussed previously in connection with Title VII, there is insufficient evidence for a reasonable fact finder to uncover any genuine issue of material fact relating to plaintiff's sex discrimination claim.  The record shows that the Company acted with legitimate grounds reasonably linked to the proper operation of the employer's business, not with sex animus.  In consequence, as with the Title VII claim, plaintiff's Law 100 claim must be dismissed.  See, López-Hernández v. Terumo Puerto Rico LLC, No. 21-1363, slip op. at 22 (1st Cir. March 30, 2023)(affirming dismissal of discrimination claim under Law 100 for the same reasons that the Court of Appeals affirmed the dismissal of Title VII claims).

## C. Law 80

Plaintiff alleges that the was terminated without just cause under Law 80 (Docket No. 1).  This statute makes private sector employers liable for an indemnity to employees hired for undefined term who are discharged without just cause.  See, Article 1 of Law 80, P.R. Laws Ann. tit. 29 § 185a (stating coverage and payment obligation).  It contains a general definition of just cause and provides guidance on the application of this concept through various examples, relating to employee misconduct and performance, and downsizings and shutdowns.  See, Article 2 of Law 80, P.R. Laws Ann. tit. 29 § 185b (general definition and examples).[17]  In this setting, a just discharge is one where the employer provides a considered, non-arbitrary reason for an employee's termination that bears some relationship to the business' operation.  See, Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 140 (1st Cir. 2017)(stating proposition).  By contrast, a

---

[17] As for performance, it recognizes as just cause, that the employee engages in a pattern of deficient, inefficient, unsatisfactory, poor, slow, or negligent performance.  This includes noncompliance with the employer's quality and safety rules and standards, low productivity, lack of competence or ability to perform the work at reasonable levels as required by the employer and repeated complaints from the employer's customers.  See, Article 2 of Law 80, P.R. Laws Ann. tit. 29 § 185b.

discharge made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment is not considered just.  Id.

Under Law 80, the employee bears the initial burden of alleging unjustified dismissal and of proving termination.  See, García-García v. Costco Wholesale Corp., 878 F.3d 411, 420 (1st Cir. 2017)(describing framework).  Should the employee meet this burden, the burden shifts to the employer to show, by a preponderance of the evidence, that the discharge was justified.  Id.  If the employer shoulders the burden, the employee must rebut the showing of just cause.  Id.  Plaintiff met his initial burden, for there is no controversy that his employment terminated and according to the complaint, his employment terminated without just cause (Docket No. 1, ¶¶ 45, 46).

As to Ethicon's burden, the Company presented evidence that the decision to terminate plaintiff's employment was based on legitimate grounds reasonably linked to the Company's business.  As discussed above, it is uncontested that plaintiff failed to adequately perform his role as PQL and satisfy the performance expectations of his employer.  On multiple occasions, Ethicon notified him of his frequent deficiencies and overall subpar performance.  Ethicon attempted to get him back on track through the BSN and PIP, which included a comprehensive plan or checklist as to the corrective actions that he needed to take to satisfactorily perform his role as PQL.  But, despite the many opportunities afforded, he was ultimately unable to meaningfully improve his performance and meet expectations.

Against this backdrop, the discharge was not at the mere whim of the employer, but instead for reasons linked to the proper operation of the business.  The termination was just.  In order to rebut this showing, plaintiff was required "to do more than cast doubt on Ethicon's proffered reason for his discharge."  García-García, 878 F.3d at 421.  He had to adduce probative evidence

Pedraza Meléndez v. Ethicon, LLC
Civil No. 21-1249 (PAD)
Opinion and Order
Page 32

that Ethicon did not genuinely believe in or did not in fact terminate plaintiff's employment for the reason given.  Id.  Plaintiff, however, failed to adduce sufficient evidence to meet either of these burdens.  Therefore, the Law 80 claim must be dismissed.

## IV.   CONCLUSION

For the reasons stated, defendant's motion for summary judgment (Docket No. 29) is GRANTED, and the case DISMISSED.

Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2023.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge